The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Willis and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, with the exception of the modification of Conclusion of Law 2, the addition of paragraphs 2 and 4 in the Award, and the modification of the compensation rate due plaintiff.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. At the time of the alleged injury by accident giving rise hereto, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and the defendant-employer regularly employed four or more employees, one of whom was plaintiff.
2. Aetna Casualty Surety Company was the workers' compensation insurance carrier on the risk at said time.
3. Plaintiff's average weekly wage was $122.78.
4. On October 11, 1989, plaintiff sustained a compensable injury by accident to her right foot.
5. Plaintiff's medical records were stipulated into evidence as Exhibits 2, 3, and 4.
This matter was the subject of a prior Opinion and Award of former Deputy Commissioner Roger L. Dillard, Jr. filed October 5, 1992, which is also a part of the record.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was thirty-six years old, with a date of birth of 29 October 1957. Plaintiff had completed the tenth grade and had a work history as a waitress and a truck driver. As of 11 October 1989, plaintiff had worked for defendant for about five months as a waitress. Plaintiff worked part-time for defendant, and her average weekly wage resulted in a compensation rate of $81.85.
2. Prior to 11 October 1989, plaintiff had an extensive medical history. Not all of plaintiff's medical records have been received by the Commission, although the following is a partial summary of plaintiff's prior medical treatment. Plaintiff had suffered six episodes of kidney stones, which on some occasions caused low back pain. In 1981 plaintiff began receiving treatment from a cardiologist for heart problems. In 1983, plaintiff sought treatment from Dr. James Gibbs for nausea, vomiting and diarrhea; and at this time plaintiff's symptoms were out of proportion to objective findings. Plaintiff suffered from psychiatric gastrointernal reactions. In May 1985, plaintiff returned to Dr. Gibbs for treatment of an anxiety reaction, and Dr. Gibbs prescribed Xanax. In November 1985, plaintiff returned to Dr. Gibbs, after seeing other doctors in the emergency room, and complained of upper respiratory infections. There were no physical signs to support plaintiff's claim of symptoms, however. Dr. Gibbs kept plaintiff on Xanax for at least eight months in 1985. In January 1986, plaintiff reported to the emergency room with complaints of pain of the uterus, and in May 1986, plaintiff reported to the emergency room with a "swollen stomach." In October 1986, plaintiff returned to Dr. Gibbs and reported that she was under a lot of stress and that she wanted to remain at home and start a family. Also in October 1986, Dr. Gibbs performed a third endoscopic examination, and the doctor concluded that plaintiff's complaints were "driven by non-physiological problems." In May 1987, plaintiff returned to the emergency room with complaints of low back pain. In September 1987, plaintiff returned to the emergency room with complaints of low back pain, and at this time she was taking Xanax and Halcion. In October 1987, plaintiff returned to the emergency room where she was diagnosed with anxiety and given Vistaril. In April 1988, plaintiff reported to the emergency room for pain of her right wrist with no known injury, and the doctors considered a diagnosis of carpal tunnel syndrome. In June 1988, plaintiff returned to the emergency room for pain in her wrist, and plaintiff reported that she was taking Xanax. In July 1988, plaintiff returned to the emergency room with several problems, and at this time she smelled of alcohol. In July and September 1988, plaintiff reported to her doctors that she was unemployed. In September 1988, plaintiff reported to the emergency room with complaints of diffuse arthralgias and myalgias. In October 1988, plaintiff had a follow-up examination for heart problems. In January 1989, plaintiff returned to the emergency room and was diagnosed with major depression and alcoholic gastritis. In March 1989, plaintiff returned to the emergency room with complaints of headaches, blurred vision and pressure in her head for three weeks.
3. The above-noted medical history is relevant to the present case because plaintiff continues to complain of symptoms which are very similar to the symptoms she had suffered for several years before the present case arose.
4. Paragraphs 4 through 7 are background information, consistent with the prior Opinion and Award by Deputy Commissioner Dillard. In May 1989, plaintiff began to work for defendant. On 11 October 1989, she dropped a pan of dishes on her right foot. In the prior Opinion and Award, this incident was found to be an injury by accident arising out of and in the course of plaintiff's employment with defendant-employer. Plaintiff worked for three days after the accident, and then sought medical treatment. Dr. Templon referred plaintiff to Dr. Soulsby, and Dr. Soulsby provided conservative treatment for about three months. On 16 January 1990, Dr. Soulsby performed surgery to remove the sesamoid bone of plaintiff's right great toe.
5. Plaintiff claimed that her condition did not improve and that she was experiencing considerable pain in the right foot after her surgery. The defendant-insurance carrier referred plaintiff to Dr. John Frederick Camp at the Orthopedic Hospital in Charlotte. During treatment, plaintiff did poorly in the work hardening program and lacked motivation. Because of inconsistent results, she was discharged from the program. Plaintiff was not warned that her attendance and participation was adversely affecting her qualifications to remain in the program. On 1 October 1990, Dr. Camp released plaintiff from his care and was of the opinion that plaintiff retained a five percent permanent partial impairment to her right leg and that plaintiff could return to work at light duty.
6. Defendant and plaintiff did not enter into an agreement for compensation (I.C. Form 21); however, plaintiff was paid temporary total disability compensation for about one year, through 26 October 1990. Based on Dr. Camp's opinion, defendant stopped payment of temporary total disability compensation and stopped providing medical treatment to plaintiff. Pursuant to an Order of the Industrial Commission, plaintiff received an independent medical evaluation at the Pain Control Center at Bowman Gray School of Medicine (hereinafter "Bowman Gray"). It was the opinion of Dr. Rauck, Director of the Pain Center, that plaintiff could not return to work until she received additional treatment through the Pain Center.
7. Defendant was ordered by the Industrial Commission to resume temporary total disability compensation and to pay for treatment at the Pain Center. Deputy Commissioner Dillard found that plaintiff "is suitable at some point in time to return to gainful employment, but she is initially in need of further treatment for her reflex sympathetic dystrophy and associated right foot pain." The Deputy Commissioner further found: "It is anticipated that after treatment [at the Pain Center], plaintiff will be a candidate to return to gainful employment and that their [the Pain Center's] treatment will assist in affecting a cure for plaintiff's reflex sympathetic dystrophy and reducing her period of disability, as well as giving her relief from her pain."
8. After the hearing by Deputy Commissioner Dillard in August 1991, but before the Opinion and Award of October 1992, plaintiff was referred for treatment to Dr. Karen Smith, a fellow of Cardiology at Bowman Gray. The first examination by Dr. Smith was on 17 December 1991, at which time, plaintiff complained of a rapid heartbeat and lightheadedness for seven months. Dr. Smith performed tests; and at this time there was no mitral valve prolapse of the heart, although this condition can be an intermittent condition.
9. In April 1992, Dr. Smith examined plaintiff for complaints of heart palpitations and headaches. The doctor diagnosed tachycardia secondary to anxiety and pain. In July 1992, Dr. Smith prescribed Valium at plaintiff's request for problems in her personal life.
10. One month after the prior Opinion and Award, plaintiff was admitted to Bowman Gray for a continuous epidural infusion. Dr. Rauck supervised the multi-disciplined treatment offered at the Pain Center. Plaintiff did not object to this treatment, which she had sought, although she reported that it offered her no lasting relief.
11. On 18 February 1993, three years and four months after her accident, plaintiff reached maximum medical improvement and the healing period for her right foot ended. This finding is based on the opinions of Dr. Rauck, plaintiff's then primary treating physician and a physician of plaintiff's choice.
12. During treatment by Dr. Smith in 1992 and 1993, plaintiff gave numerous reasons, other than her accident at work, for stress and anxiety in her life.
13. On 2 August 1993, plaintiff returned to the Pain Center and was examined by Dr. Larry Young, a psychiatrist at the Pain Center. During this examination, plaintiff demonstrated "inappropriate behavior."
14. On the same day, 2 August 1993, plaintiff was examined by Dr. Rauck. At this time Dr. Rauck was of the opinion that plaintiff retained a fifteen percent permanent partial impairment to her right lower extremity; and he wrote that plaintiff needed "less medical care" and that she needed to settle her case. One month later, on 2 September 1993, plaintiff suffered from "multiple somatic complaints," and Dr. Rauck told plaintiff that there was nothing further that the Pain Center could offer for her. On 10 September 1993, Dr. Rauck approved a job as a cashier in defendant's restaurant as a job plaintiff could perform. On 4 October 1993, plaintiff returned to Dr. Rauck with complaints of right knee pain. At this time, plaintiff suffered from an old Baker's cyst, and again Dr. Rauck told plaintiff that there was nothing further the Pain Center could offer for her.
15. On 15 October 1993, four years after her accident, defendant offered plaintiff the job as a cashier which had been approved by Dr. Rauck. Plaintiff did not accept this job offer.
16. On 18 November 1993, one month after the job offer, plaintiff returned to Dr. Poehling. This was the first examination by Dr. Poehling in one and one-half years, since Dr. Poehling had referred plaintiff to Dr. Rauck. Plaintiff complained to Dr. Poehling of pain in her right knee, and Dr. Poehling ordered an MRI. The results of the MRI were within normal limits, except for the old Baker's cyst. Dr. Poehling believed plaintiff was referred back to him by Dr. Rauck, although Dr. Rauck had not referred plaintiff back to Dr. Poehling; and Dr. Poehling did not know that Dr. Rauck had approved a job for plaintiff within her restrictions nor that the job had been offered to her by the defendant. On 9 January 1994, Dr. Poehling agreed that plaintiff should try the job as a cashier; however, at his deposition he had changed his opinion and believed that plaintiff was permanently and totally disabled.
17. On 4 January 1994, defendant referred plaintiff for an independent medical evaluation by Dr. Robert Elkins, an orthopedic surgeon who spends approximately ninety percent of his practice performing independent medical evaluations. During this examination, plaintiff's responses were not consistent and not explainable on a physiological basis. For example: when sitting, plaintiff flexed her hips to 90°, but when she was asked to demonstrate flexion, she flexed only 30°. Her straight leg raising test was negative to 90° in a sitting position, which was not consistent with other physical responses. Multiple Waddell's signs were positive; for example: when pressing the top of plaintiff's head, she complained of pain radiating down her right arm, and down to her right buttocks, thigh, calf and foot. This would be a claim of pain down the entire right side of her body. At the deposition of Dr. Griffin, a psychiatrist, Dr. Griffin was asked to define "conversion disorder"; and the doctor said: "[It] would be a willful, subconscious, deliberate presentation of a physical symptom for secondary gain." When asked to explain how he could determine when a conversion disorder was present, Dr. Griffin said:
 "Well, if it is a genuine medical illness, the physical symptoms will not change. So the basic underlying pathophysiology remains the same. The patient's presentation of it will change, but the underlying organ dysfunction will be consistent.
 A conversion disorder will change, and there will be no anatomical, neurological, physical sense to the patient's presentation; and the nice presentation is the patient who comes in who has a pinprick difference of the sensation from one side of the forehead and right down the body as though someone had taken a knife and cut her right down. This side, no feeling; this side has feeling. There is no anatomical reason to do that. It doesn't make sense, so that has to be a subconscious willed presentation of what the patient thinks her problem is."
18. On 26 April 1994, Dr. Smith admitted plaintiff to the psychiatric ward at Bowman Gray. Plaintiff reported that five cousins, one brother and an uncle had committed suicide in the past. Plaintiff reported that she was taking "street Valium." Upon admission, plaintiff smelled of alcohol. Plaintiff remained the psychiatric ward overnight, but reported that she did not want this treatment. Plaintiff's brother arrived early in the morning after her admission in an intoxicated state and harassed hospital personnel. Security officers were called to remove plaintiff's brother, and plaintiff was discharged.
19. On 5 August 1994, plaintiff was examined by Dr. Christopher Philipport, a resident at Bowman Gray who was not licensed to practice medicine. Plaintiff reported multiple complaints to Dr. Philipport, including an inability to control her bladder and bowels. The medication that plaintiff was taking at that time had a side effect of constipation and urinary retention, but not lack of control of the bowel and bladder. Dr. Philipport prescribed liquid Demeral. It was Dr. Philipport's opinion that plaintiff could perform a job if she was allowed to sit and not stand on her feet all day.
20. At the hearing in October 1994, plaintiff described intense pain over her entire body, including pain which ran up her spine and into her internal organs. Plaintiff described the intensity as constant and almost unbearable. Because of her claim of pain, plaintiff testified that she was bedridden, could not bathe herself, and could not drive a car because she could not press the brake pedal. In addition, plaintiff claimed that her accident of 11 October 1989 had caused heart problems, bladder/bowel incontinence, seizures, loss of memory, low back pain, difficulty sleeping, and a give-away weakness of her right knee which required that she walk with a cane. Plaintiff has not looked for work. It was plaintiff's position that she is permanently and totally disabled and will never work again for the rest of her life. Plaintiff was 36 years old at the time of the hearing before the Deputy Commissioner, and 32 years old at the time of her accident.
21. Regarding plaintiff's alleged heart condition, Dr. Smith, Dr. Rauck and Dr. Poehling expressed the opinion that reflex sympathetic dystrophy would not cause heart problems. Based on their opinions and on plaintiff's history of similar complaints, the Full Commission finds that the accident of 11 October 1989 did not cause any later heart problems and that no medical treatment received for her heart condition was made necessary as a result of the accident of 11 October 1989.
22. Regarding plaintiff's claim of widespread and intense pain, Dr. Elkins and Dr. Gibbs testified that reflex sympathetic dystrophy is usually restricted to the affected limb. No doctor has explained how reflex sympathetic dystrophy could spread from plaintiff's right foot to her entire body, including her internal organs. No doctor has explained how reflex sympathetic dystrophy could cause seizures, which plaintiff had reported before her accident, bowel/bladder incontinence (the drugs plaintiff was taking would cause the opposite effect), or memory loss and give-away weaknesses. Plaintiff's medical condition is complicated, and based on the lack of an expert opinion and on plaintiff's history of similar complaints in that she complained of diffuse arthralgias and myalgias one year before her accident, there is insufficient evidence of record from which to prove by its greater weight that plaintiff's current, alleged physical problems were caused by her accident of 11 October 1989. Further, there is insufficient evidence of record from which to prove by its greater weight that any medical treatment plaintiff received after 18 February 1993 was made necessary as a result of the accident of 11 October 1989. At the time of the hearing, no medical treatment had been recommended for plaintiff, except that Dr. Poehling recommended that a doctor examine plaintiff three or four times a year to review her drug use.
23. Regarding plaintiff's continuing psychological problems, based on her history of similar problems and treatment, there is insufficient evidence of record from which to prove by its greater weight that plaintiff's continuing psychological problems were caused by or triggered by the accident of 11 October 1989.
24. Regarding plaintiff's ability to return to work, the Industrial Commission has already given plaintiff the benefit of the doubt. In October 1990, plaintiff was released to return to work and a job was offered to her which was approved by Dr. Camp. However, plaintiff sought additional medical treatment; and the Industrial Commission ordered defendants to pay for the treatment at the Pain Clinic at Bowman Gray and to pay temporary total disability compensation while plaintiff was undergoing the treatment. As a result, defendants paid for the medical treatment at the Pain Center at Bowman Gray and paid temporary total disability compensation from October 1990 through November 1993, which was three years in addition to the one year they had voluntarily paid. As of September 1993, Dr. Rauck, the doctor of plaintiff's choice, approved a job as being within her restrictions and defendant offered the job to plaintiff. Therefore, the Full Commission finds that any inability of plaintiff to be gainfully employed after 15 October 1993 was not caused by her accident of 11 October 1989.
25. As a result of the accident of 11 October 1989, plaintiff retains a fifteen percent permanent partial impairment to her right leg.
26. Based upon an average weekly wage of $122.78, plaintiff's compensation rate is $81.85. However, because of an incorrect compensation rate of $75.18 awarded in the Deputy Commissioners' two prior Opinion and Awards, plaintiff was underpaid $6.67 per week for a time period which cannot be determined from the record.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. As a result of the injury by accident of 11 October 1989, plaintiff is not entitled to any additional temporary total disability compensation from 15 October 1993 and continuing. N.C.G.S. § 97-29.
2. Plaintiff is entitled to compensation at the rate of $81.85 per week for thirty weeks for the fifteen percent (15%) permanent partial disability she sustained to her right leg as a result of the compensable injury by accident. N.C.G.S. 97-31(15).
3. Plaintiff is entitled to the payment of all medical expenses incurred, or to be incurred, as a result of her injury by accident of 11 October 1989. Said medical expenses shall not include any medical expenses for treatment plaintiff has received for her alleged heart condition nor for her psychological problems. Said medical treatment shall not include expenses for any medical treatment plaintiff has received from 18 February 1993 and continuing. N.C.G.S. § 97-25. Brewington v. Rigsbee AutoParts, 69 N.C. App. 168, 316 S.E.2d 336 (1984); Click v. FreightCarriers, 41 N.C. App. 458, 255 S.E.2d 192 (1979).
4. Plaintiff is entitled to payment of $6.67 per week for all weeks plaintiff was underpaid pursuant to the incorrect compensation rate used in the Deputy Commissioners' prior Opinion and Awards.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Plaintiff's claim for permanent and total disability compensation, or for additional temporary total disability compensation, must be, and the same is hereby, DENIED.
2. Defendants shall pay compensation to plaintiff at the rate of $81.85 per week for thirty weeks for the fifteen percent (15%) permanent partial disability she sustained to her right leg as a result of the compensable injury by accident. This compensation has accrued and shall be paid in a lump sum, subject to the attorney's fee approved below.
3. Defendants shall pay all medical expenses incurred, or to be incurred, as a result of the injury by accident of 11 October 1989. Said medical expenses shall not include any medical expenses plaintiff has received for her alleged heart condition nor for her psychological problems. Said medical treatment shall not include any future medical expenses after 18 February 1993 until such time as plaintiff comes forward with credible and convincing evidence that said future medical expenses are related to her injury by accident of 11 October 1989.
4. Defendant shall pay plaintiff $6.67 per week for all weeks plaintiff was underpaid pursuant to the incorrect compensation rate used in the Deputy Commissioners' prior Opinion and Awards
5. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff in paragraph two of this Award is approved for plaintiff's counsel and shall be deducted from the lump sum due plaintiff and paid directly to her counsel.
6. Each side shall pay its own costs, except that defendants shall pay an expert witness fee in the amount of $250.00 to Dr. Poehling, $250.00 to Dr. Rauck, $200.00 to Dr. Griffin, $150.00 to Dr. Gibbs, $200.00 to Dr. Smith, $250.00 to Dr. Elkins, and $150.00 to Dr. Philipport, to the extent that these previously awarded fees have not already been paid.
 S/ _________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ _________________________ J. RANDOLPH WARD COMMISSIONER
S/ _________________________ BERNADINE S. BALLANCE COMMISSIONER